The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having in mind a form of business before the Honorable, the Judges of the United States Court of Appeals, are admonished to give their attention for the Court is now sitting. God save the United States and His Honorable Court. All right. Good morning, everyone. Welcome to the Fourth Circuit. Joining me this morning are my colleagues, Judge Stephanie Thacker via video and Senior Judge Bill Traxler on the phone. Our first case this morning is Driskell v. Summit Contracting. And Mr. Belcher, whenever you're ready. Thank you. May it please the Court. I'm Reggie Belcher, Reginald Belcher. And with me is my law partner, Richard Taylor Speer. And we represent Summit Contracting Group, Incorporated. We're just referred to as Summit throughout the morning. And we will refer to the plaintiff appellee as Mr. Driskell. I will address Summit's appeal and Mr. Speer will respond to Driskell's cross appeal. On Summit's appeal, we request that the Court reverse and vacate the judgment from the District Court. We have provided a rather lengthy factual recitation in our brief. So I will just give a short summary of the undisputed facts before we discuss the legal issues on appeal. Summit employed Driskell for approximately 46 days. He started working at a job site in Columbia, South Carolina, ultimately a few days into his employment. The company moved him to a job site in Charlotte, North Carolina. During the short time period he worked with the company, he engaged in two off-duty, off-the-clock confrontations with his direct supervisor, Daniel Reiner. The second confrontation resulted in Driskell being insubordinate with Mr. Reiner, cursing Mr. Reiner. They engaged in a physical altercation where plaintiff beat up Mr. Reiner, who was forced to wear a neck brace for several weeks. Although Driskell had no paid or unpaid time off, he missed work for the next three days. During that time period, the company's division engineer, Zach Graham, told Driskell's father, who was also a supervisor at Summit, that the company would transfer Driskell back to the job site in Columbia, South Carolina. Four days after the altercation with Mr. Reiner, Driskell showed up at the Columbia, South Carolina job site, turned in his equipment, didn't perform any job duties. He quit, and that's one of the central issues. That is the central issue in appeal, is the fact that Driskell quit. We'll briefly remind the court of the standard on appeal for judgment as a matter of law. Summit's position is that Mr. Driskell, or rather, excuse me, that Summit should have won directed verdict and should have also prevailed on its motion for judgment as a matter of law. The Fourth Circuit, in the case Bennett v. CSX Transportation from 2014, in that case, the Fourth Circuit quoted Merrick v. Prime Insurance Syndicate, a Fourth Circuit case from 2005, and said this, if a reasonable jury could reach only one conclusion based on the evidence, or if the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture, judgment as a matter of law must be entered. It's our position that plaintiff's entire case rested on speculation and conjecture, particularly the alleged discharge. The undisputed evidence in the case showed that Summit did not discharge Driskell, that he quit. It was a voluntary resignation. Approximately 36 days after Driskell quit at Summit, he filed a job application. Mr. Belcher? Yes? Mr. Belcher? Judge Diaz here. I have a couple of questions. Yes. So, you say that the evidence is undisputed, but isn't there evidence in the record suggesting that Mr. Driskell could have believed that he had been fired, number one, that the fellow who you say he engaged in an altercation with told him that he was fired, and number two, the electronic devices that he would typically use on the job were disconnected, suggesting that he was no longer welcome at the job site. I'm sure there's some other evidence that your colleague will point to, but I don't know that it's fair to say that the evidence is undisputed. It is undisputed because he said his position shifted frequently in the lawsuit, and he said at one point that Reiner fired him during the fight, and he moved off that position later. And, in fact, five months after he quit, he filed a charge with the North Carolina Department of Labor, and in that charge, he never said Reiner fired him. He said he deduced that the company fired him. And there's no such thing as an inferred termination or discharge or a deduced discharge. There are only three possibilities. You have a voluntary resignation. You have an involuntary termination where someone's actually discharged, or in certain limited situations, you could have a constructive discharge where someone quits, but they're able to say that they were essentially fired because the employer made their job so offensive that no reasonable person could continue working there. He never alleged constructive discharge in this case. And there's no case law, no legal theory that would allow someone in a wrongful discharge case. Excuse me, sir. I have a question. Yes. Isn't all of this something for the jury to have sorted out, and the jury heard both sides of this dispute, assuming there are disputed facts? No, there are no disputed facts. He never presented any evidence that he was fired. Reiner didn't have the authority to fire him. And there's evidence to that. He never refuted that. And there's a whole body of case law that we've cited in our brief that says you can't get to a jury. You can't get past summary judgment. You can't get past directed verdict by relying on your own inconsistent testimony and your own inconsistent version of the events, which is what he attempted to do. And that's an error that the district court made by allowing him to do that. For example, he was inconsistent on this when he says he was fired. He says Reiner fired him. And then later he says, no, Reiner didn't fire me. I deduce that I was fired. He applies for a subsequent job. And on that job application, he says he had never been fired from a job and said that that was true to the best of his knowledge. He says that Reiner, he first said that Reiner fired him on the night of July the 20th. But then in a series of text messages and emails, he said in those text messages and emails over the next three days that he was on a leave of absence. Well, again, that's inconsistent with him saying that he was fired on the 20th. You can't be on a leave of absence two and three days later if, per your own position in the case, you were fired on July the 20th. It's undisputed that no one ever told him he quit. There's no documentation, no one ever told him that he was fired. There was no documentation showing that he was fired. He told the CEO, and this again is undisputed. Yes, judge. What's what's then the explanation for the for deactivating the devices, the iPad and the iPhone? Well, he was not reporting to work when he didn't have any protected time off. He didn't have any paid or unpaid time off. And apparently the company didn't want him using their devices during that time period. He was essentially away without an excuse during that time period. No one ever told him not to report to work. And in fact, as I said before, the company's position was they'll transfer him from the Charlotte job site back to Columbia. He did go back to the Columbia job site, but he turned the rest of his equipment in, didn't perform any work. Yes, judge. What about the there's some evidence in the record I recall of Mr. Fudge's refusal to answer his calls and texts in July that might suggest that the company wanted nothing more to do with them. And in fact, he was discharged. Well, that that's, again, not an adverse action that just could indicate that Mr. Fudge was busy. The company never fired him. The fact that they didn't return a phone call or text messages is not the same as telling him that he's fired. Again, there's no legal theory that under which he could say that there's an inferred termination. And there are also emails that where the company he cited to in his brief, where the company said, all right, who's the designated terminator and who's going to give him the boot? Those emails just show that at that point he still wasn't fired. They were just discussing what they were going to do with him and with Mr. Reiner, which was reasonable and prudent under the under the circumstances. Second legal argument that we would like to discuss, and this again is clear and this again warranted both directed verdict and granting of the judgment as a matter of law, is that he engaged in no protected activity. The law is clear in North Carolina under the Rita statute through the Pierce case from the North Carolina court of appeals that we cited in our brief, that an internal complaint to a supervisor about a safety issue is not protected activity. And that's all we have here. The evidence shows that the only people who he discussed safety issues with at the company were managers or supervisors. And Pierce, the Hadley case from the fourth circuit from last year, and all of the other cases that we've cited say that an internal complaint to a manager about a supervisor is not protected activity. He has never cited any cases to the contrary. No cases to the contrary exist. Yes, judge. Judge Stacker, you're muted. Sorry. Thank you. So in your view, what would he have had to do to rise the level of protected activity when he wanted to bring the safety issues to the forefront? According to the North Carolina court of appeals in Pierce, which is again, the highest North Carolina court that's ever addressed the issue, has to be a complaint to someone outside of management. And there's no evidence that he ever did that. Someone outside of the company? Well, it could be someone within the company who's not in management, possibly. That didn't occur in this case. The only people who he complained or reported anything to or discussed any of these issues with were all... Who is a person in the company that would be someone he would report to that would not be in management? Wouldn't they have to be his superior? Not necessarily. You go back to the company. The company had a policy on this, an alternate dispute resolution policy in its handbook. And in that policy, the company clearly said, if you want to report a safety issue, you can go to anyone in management, any supervisor, any manager, all the way up to the CEO. And so it was within that policy that he acted and he only reported or discussed safety issues to people within management per that policy. And according to the Pierce case and all those other cases cited in our brief, that's not enough to constitute protected activity. So in this case, we didn't have an adverse action because he quit. He was not fired. And then even if there were an adverse action, he didn't engage in any protected activity. So on either or both of those grounds, Summit was entitled to directed verdict and judgment as a matter of law. OK, so it does sound like you're saying for it to have risen to the level of protected activity, he would have had to go to someone outside the company. Yes, it's typically set up under the Rita Act that you would go to OSHA, for example, to file a safety complaint. He never did that. The evidence is undisputed. He never raised an issue of safety, never raised an issue of workers' compensation at all with anyone. But with safety, he only raised the issue with folks inside that management, inside that management team. The next point is a workers' compensation issue. He failed to exhaust his administrative remedies. In North Carolina, you have to file a claim with the North Carolina Department of Labor within 180 days of an adverse action. Again, there was no adverse action here. He filed a claim with the North Carolina Department of Labor. In that claim, he never raised any workers' compensation issues. Outside of the 180-day period, his lawyer sent a letter and for the first time raised a workers' compensation issue. The problem with that is it was outside the 180-day period. And secondly, we've cited cases that say that a letter from an attorney does not raise an issue, does not exhaust administrative remedy. It has to be a signed, sworn statement from the claimant himself. He didn't do that. So that's an additional basis that the company should have won directed verdict and judgment as a matter of law in that he failed to exhaust his administrative remedies on workers' compensation with RETA. Mr. Belcher, you're a bit over your time. So I'm going to stop you there and ask Mr. Van Kampen to respond. Thank you, Joe. Mr. Van Kampen, we're having trouble hearing you. Am I not talking? That's better. I guess you need to get closer to the mic, whatever mic you're using. All right. I'll speak up. So your honors, I'm going to dispense with the appellant's attempts to relitigate facts in this case. And essentially they would be asking you to reverse the standard and grant reasonable inferences in their favor, many of the number of issues that Mr. Belcher addressed. Instead, I think I can be most useful in your deliberations focusing on the RETA OSHA claim. Your honor, Judge Whitney correctly held and charged the jury that appellee engaged in protected activity by communicating with Summit's CEO about a health and safety risk, that being having a superintendent who was under the influence of alcohol on a construction job site. And furthermore, the court should roundly reject the appellant's argument that the North Carolina RETA statute somehow excludes internal health and safety complaints. And I would urge the court not to endorse their argument. Well, opposing counsel points to North Carolina case law as well as a case from the Fourth Circuit, albeit unpublished for that point. What is your support for your argument that internal complaints are sufficient to rise to the level of protected activity? Yes, ma'am. Well, I would point you to the plain meaning of the statute, frankly. So the North Carolina RETA statute provides, in part, that it covers actual or threatened complaints, including the providing of information, the initiation of inquiries. And this is the most important part of the language, to any person. And the statute, in turn, defines any person to include any individual and any corporation. And every other court that's looked at this has glossed right over the definition of person in that RETA statute. And it clearly covers not only individuals, any individual, but also any corporation. So on its page, you can see that it's very broadly written, in fact, to the extent that it's not in the statute. And moving from there, Your Honor, to the statute and its purpose, you are the first court to have access to the Workplace Safety Health Legislation Report that actually goes into detail about why RETA was passed. And that report describes RETA as a, quote, enhanced retaliatory discrimination law arising from the worst industrial accident in North Carolina in 1991, in which 24 people died because the fire exits and another 50 grievously injured. And it was in response to that, that the General Assembly passed actually 11 different bills that were health and safety related. RETA was one of them. And in that legislative history in this report, I'm telling you about, they squarely address internal complaints. I read from that report. It says the courts have extended the protection of the law to cover complaints, not only to OSHA, but also to the employer and other persons. Furthermore, that's the judicial... And just to make sure I'm clear, he never made a report at any time to OSHA. Is that right? Yes, ma'am. Did he ever make a workers' comp complaint? No, he didn't file a workers' comp complaint, no, ma'am. But that report goes on to state that the judicial constructions of these laws have been codified as part of RETA. So you need to look at cases that were passed and intended to be codified by the RETA statute. And there we go to the Brooks decision. So in the Brooks decision, that court of appeals case, the North Carolina, that was under the North Carolina OSHA statute. And the court there found, quote, no question that an electrician's safety complaints to an assistant manager, plant superintendent, and plant manager were protected activities. And again, this was under the predecessor statute that RETA expanded and enhanced. So when you see language in the RETA statute about any person, provide information, initiate an inquiry, these are expansions in response to that fire. Now, the appellant in this case would have the bench essentially rewrite the RETA statute to somehow carve out internal complaints and attempts to pervert an ADR policy into what would essentially be a catch and kill operation where employees would see a health and safety issue, follow the company policy and report it up a grievance procedure, report it to the CEO, and then be vulnerable to be fired for it. And I would submit to you that the whole purpose of RETA was to encourage employees to make complaints to anybody. So RETA statute simply does not support any interpretation that would carve out any sort of internal complaint activity. Furthermore, I would point you to the Bigelow v. City of Hamlet decision, 2013 court of appeals case, where the plaintiff was a and unsafe working conditions and reported it to their supervisor's boss. So one up from their boss. And that was determined to be protected activity under wrongful discharge, citing RETA statute as a policy. So, you know, here we're not talking about there wasn't a complaint to Mr. Fudge, or a report to Mr. Fudge, the federal manager. We hit a grand slam in the sense that we're talking about providing information and initiation of an inquiry to a company's CEO itself. And then furthermore, on the back side, once that investigation occurred, Mr. Driscoll then provided more health and safety information to the investigator, who was the general superintendent. Mr. Van Kampen, I appreciate your focus on that, the sort of the public policy aspects of this case. But I imagine none of this matters if, in the record, doesn't support a finding that your client was discharged. And Mr. Belcher spent a good bit of time talking about that and pointing to the record evidence, including statements by your client, internal emails by the company indicating that they were thinking about firing Mr. Driscoll, but apparently hadn't gotten around to it, at least in their telling of the evidence. So I'd like you to spend at least a few minutes talking about that, because I imagine it's not the strongest on this issue of discharge. Well, you know, and obviously we have to remember the standard here, which is every reasonable inference has to be taken in the principal's favor. But so you have you have an attack. Mr. Driscoll is told by Mr. Reiner that he is terminated. So start there. Right. So let me stop you there. So he was told that. But then he talks to the CEO. There's evidence in the record. The person who would have the ultimate authority as to whether or not to discharge him tells him that don't ignore Reiner. You're not just you're not fired. You know, I'm telling you, you're not fired. Why would a reasonable jury accept that notion that Reiner had the authority to fire him based on that? And he didn't have the authority to fire him. But understand, Mr. Driscoll said this, you know, his boss had already told him he was fired. Mr. Padgett said he wasn't. After that, he goes to the hospital. He is in steady communication, but via text and via phone calls, inquiring about when he can return to work, lets him know when the hospital has cleared him to work. And we know from Summit's own e-mails, Mr. You know, Mr. Driscoll eventually realizes I better go above Mr. Fudge's head. And he actually e-mails Mark Padgett asking for direction and letting them know that he's ready to return to work. And then in response to that, Nicole Padgett admits that they are deliberately ignoring those requests to return because they're talking to a lawyer. And that then triggers, you know, deliberations about who is going to be the designated terminator. And even a recognition that the investigator would have a, quote, personal motivation to fire Mr. Driscoll. So the company's own internal e-mails are acknowledging that Mr. Driscoll hasn't resigned. In fact, they're strategizing about who to, who should turn to, and then remember, just like you said, he. Excuse, excuse me. If he, if Mr. Driscoll had not resigned, why didn't he show up to work? Well, it was, well, Your Honor, it was obvious to him by virtue of the fact that his many, many inquiries about returning to work were ignored and the fact that his devices were suddenly turned off. I mean, I think any. Why was he, why was he making inquiries about returning to work? Why wouldn't he just return to work? Well, because when you, when you suffer an injury and then you go to a hospital and you're, you're out for a few days for medical reasons, you then, you then contact your employer to coordinate your return. And that, that's just what happens in the real world, Your Honor. And that's what Mr. Driscoll did. So when do you say, when do you say, Mr. Van Kampen, that he was fired? Mr. Driscoll testified that he was ultimately fired on July 23rd, 2015. And that is what happened on, what happened on that day. Go ahead. At that point, he turned in the equipment that was no, that was locked. So when you have a locked equipment and also everybody is ignoring your email. I mean, he did everything but send a smoke signal attempting to return to work. It was plain to him. And frankly, it was plain to the jury. And I think we have to be careful about really relitigating facts the jury weighed in this case. You know, with that, I'd like to transition to another topic, unless you have any questions about that, which is the Rita complaint, but on the workers' compensation side of this case. Your Honor, the district court correctly relied on ables in recognizing that the ables were covered by Rita and that is, in turn, supported by the plain meaning of the Rita statute, which does not require a filing of a claim or or a complaint. And so, you know, Mr. Belcher has been unable to cite any cases in which, in which cowards ables have flexibility to anticipatory firings. And what's interesting is that the ables court was interpreting the workers' compensation act retaliation provision, which, as we all know, was enhanced and given and given a booster shot. And with respect to the exhaustion argument, Your Honor, Mr. Belcher and appellants have pointed to no North Carolina case law supporting an exhaustion dismissal based on the scope of a Rita charge. And so did Judge Whitney correctly decline to extend the federal exhaustion case law into into the Rita statute, which is obviously a remedial statute? And then in the last minute, I also want to address the wrongful discharge claim based on public policy, because this is, I think, important to citizens in North Carolina. Your Honor, Judge Whitney correctly recognized that, you know, where there is a situation that an employee is attacked by his supervisor and is told by management, including the CEO of the company, not to call the police. He calls the police anyway, takes out a warrant on the supervisor and is then fired. In that in that instance, you know, he's exercising his rights under the criminal statute. And I would point you to the Lenzer case and the Combs case as dispositive. Both decisions recognize criminal statutes as, you know, as actually providing a public policy basis for those wrongful discharge courts. And I see my time is up. Can I answer any other questions for you? Judge Traxler, do you have any additional any questions for Mr. Van Kampen? No, thank you for asking me. Judge Thacker. All right. Thank you, Mr. Van Kampen. Mr. Belcher, you've got some time for rebuttal. We had reserved six minutes and we reserved that six minutes for Mr. Spear to address the cross appeal issues. And I intend to give you that, but do you have anything to say in response to Mr. Van Kampen's argument? Yes, I would say. Yes, Judge, I would first discuss the wrongful discharge in violation of public policy. We cited two cases in our brief that are dispositive on the issue that say that in North Carolina, it's not a violation of public policy merely to fire someone based on a police report. I would also say that the Lenzer case is not on point at all. It didn't deal with a police report at all. It dealt with constitutional issues. And finally, that public policy argument is not applicable in this case because per Driscoll's testimony, Reiner fired him on July 20th during the fight. And so there couldn't be a nexus to his police argument if Reiner fired him before he ever talked about calling the police. So the timeline doesn't add up, but it again goes back to the problematic issue for Driscoll that Summit never fired him to begin with. The only one who he says ever fired him was Reiner. And then he even admits that Reiner didn't have the authority to do it and then changes his story over time as to the termination. On the Ables case, Mr. Driscoll's was a North Carolina case that preceded the RETA Act. There's no case in the history of RETA that agrees with Driscoll's position that an employer can be liable if it merely believed that someone might file the worker's compensation claim. You have to go to the plain language of RETA. The RETA language is clear that there's no such legal theory in North Carolina of anticipatory discharge based on a worker's compensation claim. You go to the plain language of the statute, and Ables preceded RETA. There is no case under RETA that has ever adopted this anticipatory discharge theory that they're pushing. It's an old theory under Ables that preceded RETA. RETA is more narrow than that. All right. Thank you, Mr. Belcher. Yes. Yes. I'd be glad to answer any specific questions the court may have. Judge Traxler, do you have any questions of Mr. Belcher? No, thank you. I'll tell you, if I have a question, I'll interrupt if that's okay. Otherwise, I'm fine. Great. Okay. Thank you, Judge. Appreciate it. All right. Thank you. Thank you. We'll now proceed to the cross appeal. Ms. Haynes. Good morning, Your Honors, and may it please the court. I've reserved one of my seven minutes for rebuttal in this matter. Your Honors, this court should reverse the district court's orders on damages and attorney fees because the North Carolina Supreme Court in United Laboratories versus Heitendahl conclusively resolved the issue in 1993. In Heitendahl, there was a common law tortuous interference claim paired with an Unfair and Deceptive Trade Practices Act statutory claim. In that court, in that case, the court required an election between the punitive damages on common law and the statutory trouble damages. However, the court permitted the plaintiff in that action to elect punitive damages under common law while still receiving their attorney's fees under the Unfair and Deceptive Trade Practices Act. In Heitendahl, the court's holding said that there's no double redress for a different interest and are not based on the same conduct on page 381 of that decision. If we look first to the different interests that are served, the summit conceded on its yellow brief that punitive damages under WDPP and WREDA attorney's fees serve different interests. Punitive damages, as your court is familiar with, are of course group punishment and deterrence, whereas attorney's fees serve a multitude of purposes, including a person who would otherwise be deterred from pursuing a claim due to economic unpredictability, as well as effective access to the judicial process. To reach the result that summit has urged today, your honors, you would have to hold that attorney's fees serve the same purpose as punitive damages, that being punishment or deterrent. That's just not the case. Then if you look to the second part of the rule in Heitendahl, so first they serve different interests, and second, they do not arise from the same course of conduct. Pursuant to Heitendahl, claims do not rise out of the same course of conduct if they require different proofs. That's on page 379 of that decision. In Heitendahl, just to illustrate how small the proof difference would have to be between claims, in Heitendahl, again, they achieve punitive damages and attorney's fees. Under Chapter 75-16.1 of the North Carolina General Statute, to achieve attorney's fees, a party has to prove willfulness under the statute. And still, even with that burden of proof, the court determined that they were different enough proofs for punitive damages and attorney's fees and allowed the plaintiff to elect both. Here, of course, there are different proofs at issue for wrongful discharge and read-up. Under wrongful discharge, Mr. Driscoll had to prove to the jury that Summit violated public policy and acted in a manner that was willful, wanton, or malicious. The jury gave him that. For read-up attorney's fees, the proof is actually to the court, first that Summit violated read-up, and then that Mr. Driscoll had hired an attorney, he incurred fees, and the fees were reasonable at the discretion of the court.  In its briefs, Summit cites Ellis v. Northern Star, which is a North Carolina Supreme Court case in 1990, before Kuykendall was decided, as well as Jennings-Glass v. Brummer, which is a North Carolina appellate court decision from 1987, also before Kuykendall was decided. They tried to muddy the water in their briefs about what the same underlying course of conduct is, and saying simply because Mr. Driscoll engaged in that same fact pattern somehow negates his ability to achieve punitive damages under common law and statutory attorney's fees. However, in both Ellis and Jennings-Glass, the issue was not between punitive damages and attorney's fees, rather those court appellates that you couldn't, you, a plaintiff, couldn't achieve punitive damages and civil damages because, of course, those damages serve the same purpose. And we properly were required to elect between tribal damages and punitive damages at trial. However, the district court declined Mr. Driscoll's election of punitive damages. Neither Ellis nor Jennings addressed the ultimate issue of whether a plaintiff who elects punitive damages is also barred from Rita's attorney's fees. However, the punitive damages and attorney fee issue was conclusively resolved by the Supreme Court of North Carolina in Kuykendall. Additionally, Your Honor, the attorney's fees are costs and not damages. Ms. Haynes, so does it matter here that the remedies in this case arise as a result of two different causes of action and that somehow makes it different? You having, having elected the cause of action with respect to compensatory damages and having chosen your remedy there and that cause of action does not allow for attorney's fees. It seems odd that you would then be allowed to nonetheless receive an award for attorney's fees for a cause of action for which there is no compensatory award. Does that, you see what I'm asking you? I do, Your Honor. And I'll point you again to the example that the court analyzed in Kuykendall where there were in fact the same common law claim for tortious interference of contract like Mr. Driscoll's common law claim for wrongful discharge. Neither of those claims on their case would provide for attorney's fees, but they do allow punitive damages. And then the attorney's fees come in under those statutory claims, which was the unfairness of the Trade Practices Act, and in Mr. Driscoll's case, we're looking at the statutory attorney's fees in RETA. And the Supreme Court of North Carolina conclusively resolved that issue and said that he may have his common law punitive damages and the statutory attorney's fees, and that's what we request today. Your Honor, I see my time is up. If there's anything else? Judge Diaz, can I ask a question? Go ahead. Two years after Kuykendall was decided, North Carolina legislature passed a statute 1D-20 that governs the election of extra compensatory remedies, and it states, a claimant must elect prior to judgment between punitive damages and any other remedy pursuant to another statute that provides for multiple damages. Are you familiar with that statute, and if you are, could you tell me why it's not applicable? I haven't prepared remarks as to that statute, Your Honor. However, Mr. Driscoll was properly required to elect his damages between punitive damages and troubled attorney's fees, and those serve the same purpose. They arise from the same sort of willful conduct, and we don't dispute that choice that he made. So he did elect remedies, and I would posit that he was in compliance with the statute Your Honor cited. All right. Thank you. Thank you. Thank you, Ms. Haynes. Mr. Speer. Mr. Speer, we can't hear you. Thank you, judges. May it please the court. Taylor Speer on behalf of Summit Contracting Group, Inc. in Greenville, South Carolina. Before I address Driscoll's cross appeal, I would like to note something that Mr. Van Kampen brought up as a rebuttal to Summit's principal appeal. And that is this post hoc rationale that Driscoll is now moving to assert protected activity on grounds that he provided information to anyone. Mr. Van Kampen told the jury very clearly in the opening statement that he was asserting protected activity on grounds that he initiated an inquiry. Your Honors, that can be found in the appendix at 976. This idea that Driscoll was providing information, quote, to anyone is a post hoc rationale developed for this appeal. And it was never something that was asserted at trial. With that, Your Honors, I will move on to the rebuttal to Driscoll's cross appeal. Summit requests three things with respect to the cross appeal. First, that this panel not reach the issue because of the dispositive issues that have been raised in Summit's own original appeal. As the court has probably already surmised, if Summit prevails on the issues that Mr. Belcher argued, this court need not reach the cross appeal for reasons that it would be moot. Secondly, we ask that this court not invade the jury's province with respect to its award of $65,000 in back pay because there was substantial evidence in the record to support that element, that verdict of back pay within the law. That back pay award does not violate the law. And secondly, with respect to, yes, Your Honor. Mr. Speier, can I ask about that? Was that really a question for the jury or for the district court to decide? I appreciate you bringing that up, Your Honor. We refuted heavily during the charge conference and brought up time and time again that the issue of back pay under Title VII is for the judge's province only. We were ultimately ruled against on that issue, but you will find much preservation on that issue in the appendix during the charge conference. We always believed that back pay could never be decided by the judge under a Supreme Court precedent that says that Title VII back pay is for the judge only and not the jury. So if for whatever reason we don't agree with you on the principal appeal, do you think the case at least needs to go back for the judge to figure out this? I mean, you quarrel with the amount or the calculation or what? What's your... Actually, we're not appealing the amount. What I'm doing here is addressing something that was in the briefs that was not argued during oral argument by Driscoll, if that makes sense, Your Honor. So, no, we believe that the $65,000 award should stand in the event that the court does not agree with us on our principal appeal. Would the court like for me to express the rationale behind that? No, no, you can go ahead. I was curious about sort of the way this award was calculated and it struck me that the district court may not have fully engaged with this issue and done what it was supposed to do with respect to the back pay. But I don't mean to cut you off. You go ahead and make your argument. Sure. Well, I think as a practical standpoint, Your Honor, to your point, does the panel need to send this back down? My argument to this panel on that ground would be the same that it would be to the district court if it did send it back down. And that is this. Driscoll asks for an editor on the issue of back pay, despite never moving for it below. We ultimately believe that this issue has been waived because the court has never spoken on whether or not enhanced back pay should be awarded. But here will be the argument to the district court, should this panel remand. Driscoll asks for nearly $40,000 in a travel per diem to be added to back pay. He also asks for $30,000 in discretionary bonus. Under this court's own precedent, back pay is restitutionary. And as Driscoll admitted under oath during his testimony that the purpose of his per diem was strictly to cover his travel expenses as a field employee while he traveled, Driscoll quit. There are no travel expenses to recompense after he quit. Therefore, the jury nor the judge, if this court remands, could ever award anything for a per diem. Secondly, with respect to this issue of discretionary bonuses, there is no evidence in the record whatsoever to support an award of a discretionary bonus, much less the $30,000 that Driscoll would ask this court to tack on. If you take those two components only and you subtract them from Driscoll's ask from this panel, you get very clearly $64,438. That's how the jury could have very easily within the law awarded what it did. Now, I'm going to move on to the second argument with respect to Kai Kendall. In the 30 years since Kai Kendall has been decided, it has never once been held to apply to anything other than the North Carolina Deceptive Unfair Trade Practices Act. And the reason for that is it's a very unique statute. The conduct that underlies liability for attorney's fees has an extra element. It requires, unlike most other statutes that exist for attorney's fees, it requires the extra additional element of an unreasonable refusal by the defendant to settle. That is not the case in RETA. RETA is a traditional prevailing party statute like Title VII for the employee. Therefore, it is always the same conduct that would belie liability for attorney's fees under the statute and punitive damages under the tort. We ask that the court affirm the district court on that issue. My time is up and I'll ask for questions. Mr. Speier, Judge Traxler asked a question about the NCGS 1-D that talks about expressly requires an election of remedies. So I guess I'd ask you to respond to the question from your perspective. It's a very wise question for this reason. This court will have to go through legal gymnastics to give Driscoll what he has asked for in this appeal. The court awarded treble damages. Driscoll in this appeal, he concedes and no one disputes in this appeal that Driscoll may not be entitled to treble damages and the punitive damages that arise under the tort. Therefore, in order to give Driscoll what he has asked for, this court will have to remand with an instruction to strike the treble damage award and then instate a punitive damage award under the tort. That is not what Driscoll has asked this court to do. Does that help answer the question? Well, I appreciate the response. Thank you very much. Okay, thank you. We'll hear from Ms. Haynes in rebuttal. Thank you, Your Honor. To make it brief, the relief that is requested for full back pay by Justin Driscoll was requested under the make-full remedies request in his timely motion found on joint appendix page 2083 through 85. And make-full remedies under RITA, if we look to the plain language of the statute, chapter 95, section 243c4 includes compensation for lost wages, lost benefits and other economic losses that were approximately caused by the retaliation. And then in the records, Your Honor, we introduced evidence at trial of pay stubs, comparable employee bonuses, the offer letter, which included benefits in the daily per diem. And from those elements that are already in the record, the court could properly award the full back pay that we've requested. Thank you for your time. Thank you for your arguments, counsel, on this case. It would be our tradition normally to come down and greet you all in person and shake your hand. Obviously, we can't do that here today, given the circumstances in which we find ourselves. But I do want to thank you for appearing before us and helping us to resolve this case. And wish you all well and that you remain safe and sound. And thanks again. And with that, the court will take a brief recess while we coordinate the next case. Thank you very much. Thank you, judges. Thank you, judges. This court will take a brief recess.
judges: Albert Diaz, Stephanie D. Thacker, William B. Traxler Jr.